## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **CHRIS PETTIT & ASSOCIATES, P.C.** | § | **LEAD CASE No. 22-50591-CAG** |
| | § | |
| **CHRISTOPHER JOHN PETTIT** | § | **SECOND CASE No. 22-50592-CAG** |
| | § | |
| | § | **Chapter 11** |
| **Jointly Administered Debtors** | § | **(Jointly Administered Under** |
| | § | **Case No. 22-50591)** |

_____

| | | |
|---|---|---|
| **MARK VERSTUYFT, ROBIN VERSTUYFT, THE BEYER LIVING TRUST, and ERIC TERRY CHAPTER 11 TRUSTEE FOR THE ESTATE OF CHRIS PETTIT & ASSOCIATES, P.C.** | § § § § § § | **Adversary No. _____** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **WELLS FARGO BANK, N.A. and CHRISTOPHER JOHN PETTIT, INDIVIDUALLY** | § § § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

COMES NOW, Mark Verstuyft, Robin Verstuyft, The Beyer Living Trust, and Eric Terry, Chapter 11 Trustee for the Estate of Chris Pettit & Associates, P.C. and file this complaint against Wells Fargo Bank, N.A., a national banking association, and Christopher John Pettit, individually, and in support thereof would respectfully show unto the Court as follows:

**I.**

**INTRODUCTION**

1.      This is the devastating story of how the greed and avarice of one man can decimate the hopes, dreams, and generational wealth of those he solicited and stole from with the aid and assistance of the fourth largest bank in this country.  The deceit and trickery of Christopher John Pettit ("Pettit") of the Plaintiffs in this case[1] under the guise and artifice of "advisor", "confidant", "counselor", and "friend" was not only enabled but succeeded by virtue of the blatant disregard of the facts and the law related to the opening and maintenance of lawyer trust accounts and the curtain of respectability extended by Wells Fargo Bank, N.A. ("Wells Fargo") over and through the trust accounts – particularly the New Mexico lawyers trust account – which Wells Fargo wrongfully opened for Pettit and which enabled the theft of tens of millions of dollars from the Plaintiffs and the enrichment of Wells Fargo and Pettit along the way.

2.      CP&A started in 1996 as an ordinary law firm through which the lawyers employed by CP&A practiced, including Pettit. Two decades later, beginning in 2017 Pettit would lay the groundwork with Wells Fargo for the manipulation of the CP&A NM IOLTA Account.[2]  That account would become the mechanism through which Pettit and Wells Fargo would steal from those entrusting their money to Pettit and Wells Fargo.  The scheme perpetrated by Pettit and Wells Fargo resulted in financial gain to both of them and was accomplished through the use and ultimate depletion of the Wells Fargo Accounts over a mere thirteen (13) months.  The actions of Pettit, which were made

---

[1]   Among the dozens of others having filed proofs of claim in Chris Pettit & Associates, P.C. ("CP&A") case.

[2]   Though Pettit opened in excess of 150 bank accounts across the country, this tale involves only those accounts located at Wells Fargo opened in 2017 but not activated until April 2021: Wells Fargo Account 9174 (the "NM IOLTA Account") and Wells Fargo Account 9720 (the "Texas IOLTA Account").

possible exclusively by Wells Fargo's willful decision to endorse and profit from the known abuse of the NM IOLTA Account, wreaked financial havoc on CP&A as well as dozens of CP&A Clients and 1031 Exchange[3] participants, including the Verstuyfts and the Beyer Living Trust (collectively the "Pettit Victims") that engaged the services of CP&A.  The losses sustained by CP&A and the Pettit Victims were made possible because of the abject disregard by Wells Fargo of its own internal documentation, existing federal law including nearly every applicable AML/BSA[4] regulation, New Mexico law regulating lawyer trust accounts, and the known violations by Pettit of the rules and regulations regarding the opening and use of the NM IOLTA Account and, on occasion, the Texas IOLTA Account.

3.      The records of Wells Fargo confirm that Pettit could not have carried out his scheme without the knowing assistance of Wells Fargo.  Wells Fargo logged the account activity in the CP&A and Pettit accounts and observed in real time that Pettit was misusing the NM IOLTA Account – a *prima facie* trust account - to operate a scam on the Pettit Victims.[5]  Though to a much lesser degree, the same improprieties were going on in the Texas IOLTA Account and were, likewise, transparent to Wells Fargo.   After sanctioning the illegal opening and use of the NM IOLTA Account by Pettit in 2017, Wells Fargo, starting nearly four years later in 2021, went on to accept tens of millions of dollars into that account, and then executed transactions through which the funds were commingled

---

3    Internal Revenue Code Section 1031 provides that the seller of real estate may avoid the recognition of gain or loss from the sale of real estate held for productive use in a trade or business or for investment if such real property is exchanged solely for real property of like kind which is to be held either for productive use in a trade or business or for investment within 180 days following the initial transfer of the property, subject to extension as provided in Section 1031.

4    AML/BSA laws refer to the collective federal anti-money laundering laws and regulations including but not limited to 12 C.F.R § 21.11, 12 C.F.R. § 21.21, 31 C.F.R. § 1010, 31 C.F.R. § 1020

5    Bridget Cerny, as the designated representative of Wells Fargo, acknowledged the "trust" nature of the NM IOLTA Account.

and then dissipated in the form of over a million dollars in cash withdrawals, transfers to Pettit's personal accounts maintained at Wells Fargo and other financial institutions, payments for personal obligations of Pettit, including payments on mortgages payable to Wells Fargo, as well as "lulling payments" to various clients of CP&A under the guise of returns on their investments, all from funds entrusted to CP&A.

4.      It is now clear that Wells Fargo initially declined to open the NM IOLTA account, in accordance with sound banking practices, but succumbed to its own avarice and greed at the insistence of multiple "Premier Private Bankers" to placate the whims of Pettit which they identified as a "very High Net Worth client who [was] being courted by The Private Bank"[6] and who insisted that the IOLTA account be opened as a NM IOLTA and _not_ a Texas IOLTA account.  Rather than following the mandates of the State Bar of New Mexico regarding the opening and maintenance of a NM IOLTA account, Wells Fargo knowingly and consciously disregarded the fact that Pettit, the sole signatory on the NM IOLTA account, _was not licensed to practice law in the State of New Mexico_, and that CP&A was not authorized to conduct business in the State of New Mexico until after the intervention of Wells Fargo.[7]

5.      Starting in April 2021, in keeping with the perceptions by Wells Fargo of the "High Net Worth" status of Pettit, it continued to disregard hundreds, if not thousands, of transactions identified by federal regulators as suspicious activity in bank accounts ("Red Flags").  Despite holding a contractual and statutory ability to terminate the relationship with Petitt at any time, Wells Fargo maintained the NM IOLTA Account and carried out Pettit's instructions accepting specious deposits, permitting nearly weekly _cash_

---

[6]   See Exhibit 1: WF-00004867
[7]   _Id._

withdrawals well in excess of the threshold reporting standards for AML/BSA[8] compliance, and executing transfers to hide the trust funds in the NM IOLTA account from the reach of the owners of those funds, including the Beyer Living Trust, CP&A, and the Verstuyfts. all while lending Pettit and his fraudulent enterprise the credibility of the country's fourth largest banking institution.

## II.
## PARTIES

### A. Plaintiffs

6.      Plaintiff Mark Verstuyft is a citizen and resident of the State of Texas.

7.      Plaintiff Robin Verstuyft is a citizen and resident of the State of Texas.

8.      Plaintiff The Beyer Living Trust is a Revocable Trust acting through its Co-Trustees, Earl Beyer and Kenneth Beyer, who are residents and citizens of Texas. Accordingly, the Beyer Living Trust is a citizen, and resident of the State of Texas.

9.      Plaintiff Eric B. Terry is the Court appointed Chapter 11 Trustee of the Estate of Chris Pettit & Associates, P.C.  The Trustee is a citizen and resident of the State of Texas.

### B. Defendants

10.      Defendant Wells Fargo Bank, N.A. is a national banking association formed in Delaware, with its principal place of business in 420 Montgomery Street, San Francisco, California.  Wells Fargo Bank, N.A. may be served with process through its registered agent for service Corporation Service Company d/b/a CSC – Lawyers Incorporating Services Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. McGuireWoods LLP, as counsel for Wells Fargo, has informed the undersigned that they

---

[8]      Anti Money Laundering and Bank Secrecy Act 12 C.F.R. § 21.21.

will accept service on behalf of Wells Fargo.

11.     Defendant Christopher John Pettit is a citizen and resident of the State of Texas.  Christopher John Pettit may be served with process at the Karnes City Detention Facility, 810 Commerce Street, Karnes City Texas 78118 Inmate ID No. WD20498510. Mr. Ron Smeberg, counsel for Christopher John Pettit, has agreed to accept service of the complaint on behalf of Mr. Pettit.

### III.
### JURISDICTION, VENUE AND CONSENT TO ENTRY OF A FINAL JUDGMENT

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Court has the constitutional authority to enter a final judgment in this matter pursuant to *Stern v. Marshall*, 564 U.S. 462 (2011) and its progeny.

13.     The Plaintiffs each consent to the entry of a final judgment in this matter by this Court.

14.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV.
### FACTUAL ALLEGATIONS

#### A.  Pettit and CP&A

15.     Pettit graduated from law school and was licensed to practice law in the State of Texas in November 1991.  According to Pettit and as substantiated by the records of the State Bar of New Mexico, Pettit was never licensed to practice law in the State of New Mexico. Based on a review of state bar licensing across the 50 states, Pettit was not licensed in any state other than the State of Texas.  Pettit began practicing law in San Antonio, Texas and focused his practice in the areas of wills & estates, probate, and

personal injury.  Pettit formed CP&A in 1996.  Though Pettit was the sole shareholder of CP&A, Pettit was not the only lawyer employed by CP&A.  CP&A employed at least 20 people including lawyers, paraprofessionals, and office personnel in furtherance of the business of CP&A. Pettit developed a niche market through the hosting of estate planning seminars primarily in Bexar and the surrounding counties focusing his efforts on rural agricultural communities and the burgeoning wealth attendant to the Eagle Ford Shale region of south Texas. As Pettit's reputation grew, the services that were offered through CP&A expanded from traditional legal services to include "investing", tax preparation, and 1031 Exchange Agent services.

16.     Based upon the proofs of claim filed in the CP&A case, Pettit began his scheme to avail himself of the assets and opportunities of CP&A and the clients of CP&A around 2007[9], nearly a decade after the formation of CP&A.   Pettit used various community banks in the greater San Antonio metropolitan area to relieve CP&A and the Pettit Victims of their hard-earned resources prior to associating with Wells Fargo starting in early 2017.  On information and belief Pettit opened accounts for CP&A with Broadway Bank, Frost Bank, Bank of San Antonio, Bank of America, TexStar National Bank and Winter Park National Bank to further his scheme to defraud the clients and 1031 Exchange counterparties of CP&A.

**B.  The 1031 Exchange Angle**

17.     Starting in the mid 2000's Pettit identified a veritable bird's nest on the ground in the form of 1031 Exchanges.  Pettit, through the use of CP&A and the client

---

[9]     The proofs of claim filed in the CP&A and Pettit cases indicate that Pettit misappropriated money belonging to CP&A and the clients of CP&A starting in the early 2000's. The Table of Claims attached hereto as Exhibit 2: shows that the earliest misappropriation occurred in 2007.

base of CP&A, held CP&A out as a "qualified intermediary" for "like kind property" exchanges pursuant to Section 1031 of the Internal Revenue Code (hereinafter a "1031 Exchange").  1031 Exchanges have limitations which include strict timing requirements (45 to 180 days)[10], property characteristic limitations (i.e. investment property for investment property)[11], and the mandate that they be undertaken by a qualified exchange agent (a disinterested person i.e. not your lawyer, accountant, investment banker, broker, or real estate agent).[12]

18.    Over the years dozens if not hundreds of 1031 Exchanges were undertaken by Pettit through the use of CP&A.  Pettit utilized local banks as the depositories for his 1031 Exchange transactions until April of 2021 when he began utilizing Wells Fargo as the primary depository bank for these transactions.

**C. Wells Fargo Enabled Pettit**

19.    In or around 2017 Pettit made the acquaintance of Maria Breen, then a Senior Private Banker with Wells Fargo.  Ms. Breen would become the conduit between Pettit and Wells Fargo, assisting Pettit in the opening of the various CP&A and personal accounts with Wells Fargo.  It was through the direct intervention of Ms. Breen along with "Premier Banker" Mark Pope, and Eliza Gomez with the NBBC[13] that Pettit was allowed, in direct violation of New Mexico State law and in contravention of the warnings from the New Mexico Secretary of State[14], to open the NM IOLTA Account (9174).[15] Ms. Breen also facilitated the opening of the original Texas IOLTA Account (5032) and Pettit's

---

[10]  IRC §1031(a)(3)
[11]  IRC §1031(a)(1)
[12]  Treas. Reg. §1.1031(k)-1(g)(4)
[13]  National Business Banking Center
[14]  See Exhibit 3: WF-00004952
[15]  See Exhibit 1: WF-00004867, Exhibit 4: WF-00004764–4770

personal account (4978).

20.     Though the NM IOLTA Account would lie dormant until April 2021 with only the initial deposit of $1,000, a $1,000 deposit in April of 2020, and a $100 deposit in February of 2021 serving as placeholders for the account, Pettit immediately began to establish his bona fides with Wells Fargo by transferring $920,000 from a CP&A account maintained at Frost Bank and styled "Estate Management Account" into Pettit's personal Wells Fargo account ending in 4978 (the "Pettit Personal Account").    Pettit almost immediately withdrew $827,298.82[16] from that account as the downpayment on the purchase of real property – 555 Argyle – that would be financed by Wells Fargo (the "Argyle Mortgage") and apparently serve as the motivation, at least in part, for Wells Fargo to disregard the original efforts of the National Business Banking Center ("NBBC") to comply with the policies of Wells Fargo and State law related to the opening of IOLTA accounts.[17]   The nearly $93,000.00 left in the Pettit Personal Account would be used to service the Argyle Mortgage through internal transfers managed and documented by Wells Fargo.   As time passed, Pettit would service the Argyle Mortgage through internal transfers often facilitated by Wells Fargo employees with funds appropriated from the New Mexico IOLTA account owned by CP&A.[18]   Wells Fargo permitted and actually facilitated the improper use of funds from the NM IOLTA Account 29 times[19] between May

---

[16]   In a preview of things to come, though the Pettit Personal Account statement for July 2017 reflects that the $827,283.82 was a "withdrawal made in a Branch/Store" Wells Fargo has not produced a corresponding Currency Transaction Report or cashier's check for the transaction. Though it does appear that the funds were used to pay the cash at closing on the purchase by Pettit of the 555 Argyle property. See Exhibit 5: Pettit Personal Account July Statement WF (2)-4978-00321–00324 and Exhibit 6: WF-00003170–3171.

[17]   See Exhibit 1: WF-00004867, Exhibit 4: WF-00004764–4770

[18]   See Exhibit 7: Pettit Personal Account Statements September 2017 through June 2022 WF (2)-4978-00321–561.

[19]   See Exhibit 8: Table of 555 Argyle Mortgage Payments

2021 and June 1, 2022, the date on which Pettit filed bankruptcy.

21.    On information and belief, Wells Fargo was a willing participant in the scheme of Pettit to defraud CP&A and the Pettit Victims because Pettit showed great potential for running millions, if not billions of dollars through the accounts he controlled at Wells Fargo.  By way of example, in February 2020, Pettit and CP&A were retained by a personal protective equipment company to act as a paymaster or escrow agent for the enterprise.  Wells Fargo, to the attention of Maria Breen, was listed as the escrow bank. The expectation relayed to Maria Breen and Wells Fargo was that the paymaster relationship would generate deposits in the range of $20 million to $2 billion annually. Though never quite reaching the values anticipated, deposits in excess of $3,000,000 were actually received and run through a CP&A account.  On information and belief, the relationship with Pettit and CP&A was fostered by one or more Wells Fargo employees, including Maria Breen, because the Wells Fargo culture financially rewarded those employees based on a number of metrics including the number of accounts opened, the amount of the daily balances in those accounts, and the amount of the deposits that were made to those accounts.  This activity is frighteningly reminiscent of the fictitious account and credit card scandal for which Wells Fargo was fined in excess of three billion dollars in 2020.[20]  With a view towards this opportunity, Wells Fargo pulled out all of the stops to get business from Pettit and CP&A contacting Pettit almost daily and offering him tickets to events, fancy dinners, and other perks.  Wells Fargo through Maria Breen encouraged Pettit to direct the clients of CP&A to bank and invest with Wells Fargo.

22.    On information and belief, as a result of the value potential afforded to Wells

---

[20]    See Exhibit 9: 2020 Deferred Prosecution Agreement

Fargo through the account activity of Pettit and CP&A, Wells Fargo either actively enabled Pettit to breach his fiduciary duties to CP&A and the Pettit Victims through the misappropriation of their assets or intentionally looked the other way allowing the fraud and breach of fiduciary duty to occur with apparent impunity through the use of the New Mexico IOLTA account.

> **i. Wells Fargo's requirement to know their customers.**

23. By mid-2017, Pettit needed to hedge against being ejected from the community banks that he had been operating through. In the summer of 2017 Pettit went to a local branch of Wells Fargo and opened the Pettit Personal Account (4978), the original Texas IOLTA Account (5032), and the NM IOLTA Account (9174).  The account opening dates were as follows:

> a. July 3, 2017 — Pettit Personal Account (4978)[21]
>
> b. August 22, 2017 — original Texas IOLTA Account (5032)[22]
>
> c. September 21, 2017 — NM IOLTA Account (9174)[23]

Pettit was at all times the sole signatory on each of these accounts.

24. On the day after the Pettit Personal Account was opened, Pettit closed on the purchase of 555 Argyle, San Antonio, Texas with Wells Fargo providing the mortgage for that property.  From the first mortgage payment in August of 2017 through end of the Pettit charade, Wells Fargo took or received payment for the personal obligation of Pettit to Wells Fargo out of the Pettit Personal Account and the NM IOLTA Account. As discussed above, Wells Fargo was paid on the Argyle Mortgage at least 29 times out of

---

[21]  See Exhibit 10: Account 4978 Opening Agreement and Signature Cards
[22]  See Exhibit 11: Account 5032 Opening Agreement and Signature Cards
[23]  See Exhibit 12: Account 9174 Opening Agreement and Signature Cards

the NM IOLTA Account.

25.     It is a fundamental tenet of banking that banks are required to know their customers and understand their customers' banking behavior.  *See* 31 C.F.R. §§ 1020.220(a)(1) and (2).   This provision is commonly referred to as the "Know Your Customer" Rule.   As a result of the Know Your Customer Rule applicable to federally chartered banks, Wells Fargo is required to collect information about the holder of each account. As part of that process, when an account is opened with Wells Fargo its employees are required to obtain information concerning the individuals who control the account along with such other information as may be required to confirm that the signatories to the account are, in fact, authorized to act in the manner proposed through the account.

26.     Wells Fargo maintains publicly[24] that it and each of its employees must comply with applicable rules, regulations, and Company policies.  At a minimum from the period of at least September 2017 through May 2022, Wells Fargo adopted the "Pettit Exception" to their compliance culture.

27.     Wells Fargo knew from the first moments of the relationship with Pettit that Pettit was suspect and should have identified Pettit and the NM IOLTA Account for monitoring.  When Pettit approached Wells Fargo to open the various accounts in the summer of 2017, Wells Fargo commenced an investigation into whether Pettit was

---

[24]   See Exhibit 13: Testimony of Wells Fargo representative Karen Nelson (Page 130, Line 5 through Page 133, Line 18); Exhibit 14: Testimony of Wells Fargo representative Bridget Cerny (At the time of the filing of this Complaint, the Cerny transcript was not available.)  Plaintiffs reserve the right to supplement with the Transcript excerpts.  See also Exhibit 15: Wells Fargo 2022 10-K.

authorized to open the NM IOLTA Account.[25]  Notwithstanding the express requirements of New Mexico law that _only_ New Mexico licensed lawyers may be signatories on a NM IOLTA account[26], Wells Fargo elected to circumvent that requirement through the acceptance of the Certificate of Authority for CP&A by the Secretary of State for the State of New Mexico.[27] Wells Fargo flagrantly and intentionally disregarded the threshold requirement of New Mexico law that each signatory to an IOLTA account in that state be licensed by the State of New Mexico to practice law. Instead, Wells Fargo opted to permit Pettit to use a "business license" as a substitute for a law license.  In this effort, Wells Fargo openly disregarded the admonition in the New Mexico Secretary of State's transmittal to CP&A which stated "[p]lease be advised that although the Certificate of Authority has been approved, you _must_ comply with all other federal or state laws applicable to your professional corporation" (emphasis added).[28] Wells Fargo welcomed Pettit with open arms for the sake of facilitating the illegal activities of its new "High Net Worth" client.

28.    Pursuant to the testimony of Bridget Cerny, the second Wells Fargo representative presented pursuant to the Court ordered examination of Wells Fargo, Wells Fargo had no responsibility to determine whether Chris Pettit actually held a New Mexico law license under either the Know Your Customer Rule[29] or the New Mexico rules

---

[25]  Wells Fargo opened Case # 129755342 prior to the date on which the NM IOLTA Account was opened. Pursuant to the HOGAN database entries "Deb with the Resolution Team has worked Case # 129755342 to conclusion.  Elisa with NBBC will open a New Mexico IOLTA.  The TX IOLTA will be closed and the funds transferred to the new account." See Exhibit 4: WF-00004764–4770, and Exhibit 16: WF-00004779–4784, and Exhibit 17: WF-00004818.

[26]  See Exhibits 18, 19, 20, and 21: NM Rule 16-115, 17-204, 24-109 and New Mexico Trust Account Manual.

[27]  See Exhibit 1: - WF-00004867, and Exhibit 3: WF-00004952

[28]  _Id._

[29]  See 31 C.F.R. 1020.220

and regulations regarding the opening, operation and maintenance of IOLTA accounts.[30]

29.    Wells Fargo is also required to develop, administer, and maintain a program to ensure compliance with federal Anti-Money-Laundering (AML) laws. *See*, 12 C.F.R. § 21.21.   The program is to be approved by the bank's board of directors and: (1) provide a system of internal controls to ensure compliance at all times, (2) provide for independent testing of the bank's ongoing compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.  In the Rule 2004 Examination of Karen Nelson, the first representative of Wells Fargo, she represented that Wells Fargo has procedures in place that comply in all respects with AML laws, and Wells Fargo complies with all applicable law.[31] Wells Fargo also continues to represent in its public filings with the Securities and Exchange Commission that compliance with "all applicable laws, regulations, and Company policies" is the obligation of each and every employee of Wells Fargo.[32]

30.    Notwithstanding the suspect nature of the relationship with Pettit from the inception of the NM IOLTA Account, "there were no Investigations regarding the opening and/or activity in the . . . CP&A Accounts" other than Case #19755342 and six (6) suspicious check investigations.[33]  As is evidenced by the notes from Case #19755342, Wells Fargo's employees abandoned its compliance promises made to the public in favor of the promise of future profitability.

---

[30]   At the time of the filing of this Complaint, the Cerny transcript was not available.  Plaintiffs reserve the right to supplement with the Transcript excerpts.

[31]   See, Exhibit 13: Testimony of Wells Fargo representative Karen Nelson (Page 130, Line 5 through Page 133, Line 18)

[32]   See Exhibit 22: Exhibit 13 of Wells Fargo's 2022 10-K, page 28

[33]   See ECF 885, page 4, paragraphs d and e.

**ii.     Wells Fargo ignored both the Know Your Customer Rule and AML laws when it came to Pettit**.

31.     Wells Fargo maintains a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The programs utilized by Wells Fargo include DIPR, EWS, Client Relationship Manager, Hogan, TellerVision, Actimize, StoreVision, and Universal Workstation.[34]  The customer due diligence programs allow Wells Fargo to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage. Actimize is an artificial intelligence and data analytics software platform. Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions. Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance Red Flags, and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

32.     Wells Fargo designates a senior bank official to be the compliance officer responsible for coordinating and monitoring compliance with federal AML laws. The compliance officer, in turn, designates an individual at each office or branch to monitor the bank's day-to-day compliance, including the branches Pettit and CP&A used to operate the NM IOLTA account.

---

[34]   *Id.* at paragraph a.

33. The federal government established the Federal Financial Institutions Examination Council ("FFIEC") in 1979. Wells Fargo receives guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct mandating further inquiry. Examples of these suspicious indicia relevant to the banking activities of Pettit at Wells Fargo include:

a. "Many funds transfers are sent in large, round dollar, hundred-dollar, or thousand-dollar amounts."

b. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c. "Unusual use of trust funds in business transactions or other financial activity."

d. "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

e. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

f. "Funds transfers contain limited content and lack related party information."

g. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

h. "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

i. "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

j. "Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

  k. "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

  l. "Funds are sent or received via international transfers from or to higher-risk locations."[35]

34. Consistent with FFIEC guidance, Wells Fargo represents that it maintains a system of controls sufficient to identify patterns of account activity, <u>particularly activity between Wells Fargo accounts</u>. The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities, can be examined through this system. Wells Fargo represents that it has procedures in place to analyze suspicious activity against the backdrop of industry norms and each customer's background. Pursuant to the FFIEC guidelines, Wells Fargo is expected to use external sources of information like the internet, commercial database searches, and direct inquiries to determine the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

35. Wells Fargo collects and maintains information about its customers and their banking behavior in order to, among other things, detect and prevent money laundering and fraud and to protect itself from third party liability and reputational injury. Wells Fargo maintains procedures to know the identity of each customer (as required by 31 C.F.R. § 1020.220(a)(1)), and to collect information about the holder of each account (as required by 31 C.F.R. § 1020.220(a)(2)). When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that Wells Fargo should collect about new business account clients includes the purpose and nature of the

---

[35] Exhibit 23: FFIEC Red Flags at pp. 1-9.

business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer. In the case of trust accounts, Wells Fargo should ascertain the actual authority of the person to act.

36.     Wells Fargo creates an initial client profile using the information collected, along with the other resources available to it like internet search engines and public and commercial record databases and assigns a compliance-related risk rating. Neither the profile, nor the risk ratingare fixed; these remain subject to change based upon the actual activity in the account and updates or changes in the customer profile. When Wells Fargo becomes aware that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in account activity. The bank may also become aware through direct notification events from governmental authorities.

37.     Under applicable federal regulations, Wells Fargo is also required to maintain internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering. Through these programs, Wells Fargo obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, Wells Fargo can predict the type and frequency of transactions in which its

customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

38.     Along the same lines, a banker processing an outgoing wire transfer is trained to ask the customer questions designed to detect possible money-laundering, including the purpose of the transaction, and the nature of the relationship between the parties. Wires between $25,000 and $100,000 automatically prompt personnel to use a checklist to evaluate the transaction. A customer service manager who approves outgoing wires often conducts a secondary review, confirming that the checklist questions were adequately addressed. Wire transactions above $100,000 require additional approval of a regional Wells Fargo employee, and transactions over $500,000 also require branch manager authorization. Similarly, before the bank credits a large check, multiple bankers review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payor, the payee (i.e., the customer), and the depositor. When these efforts detect unusual activity, employees are supposed examine the account more fully, including by reviewing the account's transaction history and consulting with employees who opened or who have worked on the account. Various branch-level personnel also regularly review Balance Fluctuation Reports. These reports highlight substantial balance fluctuations and list the account activity in the accounts covered by the reports.

39.     The activities in the NM IOLTA account starting in April 2021 began to reflect many common—and actually glaring—signs of money laundering and fraud. As noted, in early May of 2021 Wells Fargo was warned by the Supreme Court of the State of New Mexico Disciplinary Committee that Pettit was not licensed to practice law in New

Mexico when Wells Fargo received the following letter from that committee.[36]

May 12, 2021

Wells Fargo Bank, NA
IOLTA/RETA Reporting
P.O. Box 3908
Portland, OR 97208

To Whom it May Concern:

This is to acknowledge the receipt of the overdraft information against Chris Pettit & Associates. Please be advised that we are unable to process this information regarding Mr. Pettit, as he is not an attorney registered in New Mexico and is not practicing law in the state of New Mexico.

Very truly yours,

Anne L. Taylor
Chief Disciplinary Counsel

Even with direct notification from the Supreme Court of the State of New Mexico, Wells Fargo chose not to terminate or even investigate its relationship with Pettit and instead continued providing banking services to Pettit throughout the life of the scheme. Curiously, based upon the representations of counsel for Wells Fargo, there were *only* seven (7) events or activities in the NM IOLTA Account that were *ever* investigated by Wells Fargo:

      a.  The ability of Pettit, a non-lawyer in New Mexico, to be the sole signatory on the NM IOLTA Account investigated in August of 2017 (which Wells Fargo wrongfully concluded he could)[37]

---

[36]  See Exhibit 24: Letter from the Supreme Court of New Mexico containing internal comment by Wells Fargo
[37]  Exhibit 16: WF-00004779–4784

b. Suspicious Check Alert for Check No. 1270 payable to Chris Pettit investigated on April 16, 2021[38]

c. Suspicious Check Alert for Check No. 1258 payable to Chris Pettit investigated on April 16, 2021 [39]

d. Suspicious Check Alert for Check No. 1259 payable to Chris Pettit investigated on April 16, 2021[40]

e. Risky ACH alert on November 5, 2021[41]

f. Risky ACH alert on November 13, 2021[42]

40.     No other activity or transaction was investigated including the cash deposits to or withdrawals from the NM IOLTA Account[43] Indeed, there were 176 events that constituted an overdraft of the NM IOLTA Account[44] that were never investigated by Wells Fargo, notwithstanding its obligation under New Mexico law to do so.[45]  The activity in the NM IOLTA _which should have caused_ Wells Fargo to investigate Pettit were present almost daily from and after the commencement of activity in the account in April 2021. These events include:

a. The 102 discreet transfers from the NM IOLTA Account into the Pettit Personal Account;

b. The 4 discreet transfers from Pettit Personal Account into the NM IOLTA Account;

---

[38]   *Id.*
[39]   *Id.*
[40]   *Id.*
[41]   *Id.*
[42]   *Id.*
[43]   Currency Transaction Reports ("CTR's") were completed, though improperly, for most of the cash withdrawals made out of the New Mexico IOLTA Account.  Other than the completion of CTR's there is no indication that any investigation was conducted including a determination of why cash withdrawals were being undertaken when the New Mexico Rules (17-204.A.(6)) _expressly prohibit_ cash withdrawals from New Mexico IOLTA Accounts.
[44]   See Exhibit 25: Table of Overdraft Events and Fees Collected
[45]   See New Mexico Rule 17-204; "The overdraft notification provisions in this rule are intended to help prevent misappropriation by providing a method for early warning of improprieties in the handling of attorney trust accounts; the two most obvious indications of possible misappropriation are a trust account overdraft or a dishonored trust account check."

c.  The 4 discreet transfers from the CP&A Operating Account (9746) into the NM IOLTA Account;

d.  The 29 discreet transfers from the NM IOLTA to the Pettit Personal Account in satisfaction of the Argyle Mortgage;

e.  The 61 discreet transfers from the NM IOLTA Account to Green Capital Funding LLC;

f.  The 62 discreet transfers from the NM IOLTA Account to Mr Advance LLC;

g.  The 51 discreet transfers from the NM IOLTA Account to Unique Funding Solutions, LLC;

h.  The 72 discreet transfers from the NM IOLTA Account to ForwardLine Financial LLC;

i.  The 68 discreet transfers from the NM IOLTA Account to Libertas Funding;

j.  The 11 discreet transfers from the NM IOLTA Account to BHG Financial;

k.  The 156 discreet transfers form the NM IOLTA Account to IRM Capital;

l.  The 61 discreet transfers from the NM IOLTA Account to Westwood Funding for the benefit of Chris Pettit;

m.  The 41 discreet transfers from the NM IOLTA Account to Winter Park Bank for the benefit of Chris Pettit;

n.  The 25 discreet transfers from the NM IOLTA Account to American Express;

o.  The 8 discreet transfers from the NM IOLTA Account to Muebles Rusticos via Banco Santander, Mexico;

p.  The September 28, 2021 transfer to Aloha Pools for the benefit of Chris Pettit;

q.  The December 1, 2021 transfer to Ohana Outdoor Company for the benefit of Chris Pettit;

r.  The 8 discreet transfers to Barclays US Credit Card and Chase Credit Card for the benefit of Chris Pettit;

s.  The 5 discreet transfers to Wells Fargo in payment of the Wells Fargo credit cards ending in 3043 and 3050;

t.  The 77 discreet payments processed on behalf of Rustic Heritage, LLC;

u. The 34 discreet transfers to Rustic Heritage, LLC;

v. The 22 discreet cash withdrawals from the NM IOLTA Account in excess of $10,000.00;[46]

w. The 8 discreet cash deposits into the NM IOLTA Account in excess of $10,000.00;[47]

x. The attachment of a PayPal account to the NM IOLTA Account;

y. The 11 discreet transfers via PayPal to Roblox Corp.;

z. The 49 checks out of the NM IOLTA Account[48] returned for insufficient fees;

aa. The 79 wire transfers returned for insufficient fees, and;[49]

bb. The 176 discreet transactions that resulted in an NSF event or an overdraft balance in the NM IOLTA Account.

The loss to CP&A and the Pettit Victims for the categories above totals $33,111,752.45.[50]

### iii. The controls employed by Wells Fargo to guard against AML violations and fraud existed *before* Pettit starting using the NM IOLTA Account

41. Between 2011 and 2017, Wells Fargo and its affiliates incurred fines and were subject to other disciplinary measures by federal agencies for failing to comply with banking and securities regulations. A significant portion of the fines were the result of the deficiencies in Wells Fargo's AML oversight.[51] In 2013, in response to regulatory scrutiny, Wells Fargo reevaluated its compliance procedures and systems. Wells Fargo reportedly adopted a risk-management framework and made substantive changes to its systems and personnel, including realigning over 5,000 employees. The bank also reportedly developed and implemented technologies, including artificial intelligence software which

---

[46] All banks are required to complete Currency Transaction Reports on cash transactions greater than $10,000.00. Law Firms are ineligible for an exemption from this requirement. 31 CFR 1020.315(e)(8)

[47] *Id.*

[48] See Exhibit 26: WF-9174-00134–274

[49] *–Id.*

[50] See Exhibit 27: Table of Account Activity

[51] See Exhibit 28: Table of Violations and Fines

were purportedly designed to enhance Wells Fargo's account-transaction monitoring system. In 2016, a Wells Fargo executive testified to Congress that the bank's policies, procedures, and internal controls were effective and compliant with AML laws. Thus, by the time Pettit opened the NM IOLTA Account in 2017, Wells Fargo's system of internal controls, including its company-wide compliance awareness protocols, risk management framework, and monitoring technology portfolio, provided it with the tools to readily detect Pettit's misuse of the NM IOLTA Account.

42.    According to the testimony of Karen Nelson, Wells Fargo employees are trained to monitor and understand account activity and Wells Fargo requires its employees to comply with banking regulations, including basic AML guidelines, as a condition of their employment. Specifically, Wells Fargo requires each employee whose duties may require such knowledge to take a 30-to-45-minute training module annually on AML compliance so that they are equipped to detect money laundering and fraud. Additionally, supervising personnel, specially designated by Wells Fargo's chief compliance officer, oversee the day-to-day implementation of the bank's risk management framework at the individual branches. The Wells Fargo Code of Ethics and Business Conduct reinforces the bank's compliance policies, and directs employees to "complete all customer due diligence requirements[,] be alert to—and report—suspicious activity[,]" and sets the policy of "completing all required …. Compliance training on a timely basis."[52]  The Well Fargo Code of Ethics also states that the bank has adopted policies to comply with applicable laws relating to money laundering.[53] Bankers opening new accounts are trained to ask at least 20 fact-finding questions, including what the

---

[52]  See Exhibit 29: Wells Fargo Code of Ethics
[53]  *Id.* at pg. 111

account is going to be used for and the client's long-term intentions for the account. New accounts that are less than 60 days old are also subject to greater scrutiny and additional limitations, including mandatory review by additional personnel.

43.    Despite the promise of reform after the imposition of fines and consent orders; after all of the implementation of policies and procedures in furtherance of those consent orders and regulatory requirements; after the assurances of Wells Fargo personnel that _all_ laws and regulations are followed, Wells Fargo elected to adhere to its culture of systemic disregard for the rule of law including the cardinal rule for opening a lawyer's trust account in the State of New Mexico – ***that the signatory be an actual lawyer licensed in the State of New Mexico*** – Wells Fargo, with full and actual knowledge that Pettit failed to meet the threshold requirement to be allowed to open the NM IOLTA Account, Wells Fargo "closed the case" on what they knew to be a prohibiting condition, and allowed Pettit to open the NM IOLTA Account and literally steal millions of dollars from CP&A and the Pettit Victims.  It is undisputed, even by Wells Fargo[54], that Pettit was not licensed to practice law in the State of New Mexico.

### D.  New Mexico State Bar requirements for IOLTA accounts.

44.    The State Bar of New Mexico, like the State Bar of Texas, has promulgated the rules which must be followed as a condition to the opening and maintenance of an IOLTA account in the State of New Mexico. The State Bar of New Mexico has produced a Trust Account Manual[55] to assist lawyers and financial institutions with the management of client trust funds.  The Trust Account Manual defines trust funds to include:[56]

---

[54] See Exhibit 17: WF-00004818, Exhibit 30: WF-00004821–4823, and Exhibit 24: Letter from the Supreme Court of New Mexico containing internal comment by Wells Fargo
[55] Exhibit 21: New Mexico Trust Account Manual
[56] *Id.* at Pg. 1

- Money received from client for distribution to a third party to whom the client is indebted (such as money for alimony, payment of taxes, adverse judgments, or other legal obligations)

- Money received from a client for safekeeping pending the consummation of a business or investment transaction the client is contemplating and with which the attorney is providing legal assistance

- Money received from a client for safekeeping for possible distribution to a third party (such as funds to have available to settle any claims against the client which the attorney may be negotiating)

45. The Trust Account Manual directs, in accordance with Rule 17-204 of the Rules Governing Discipline that:[57]

- A record of all deposits into and withdrawal from each trust account identifying the date, source, and description of each item deposited as well as the date, payee, and purpose of each disbursement. Deposit slips shall separately identify each item deposited. Disbursements shall be made only by authorized bank transfer or check payable to a named payee but not to "cash." An attorney licensed in this state must be a signatory on the account and that attorney shall be responsible for either making or overseeing monthly reconciliations of the checkbook

balance or general ledger, the bank statement balance, and the client trust ledger balances, and the responsibility to answer questions, including from the Disciplinary Board, regarding the client trust account. (Note: No non-lawyers may be a signatory on the trust account). The designation of one or more attorneys as the person or persons responsible to make or oversee monthly reconciliations, maintain records and answer questions pertaining to trust accounts does not relieve any other attorney from his responsibility;

---

[57] *Id.* at Pg. 4

46.     The rules and regulations applicable to IOLTA accounts in the State of New Mexico include Rule 16-115, 17-204, and 24-109.  Specifically, New Mexico mandates the following, among other requirements:

  a. Only lawyers licensed in the State of New Mexico are eligible to have NM IOLTA accounts.

  b. It is impermissible to comingle a lawyer or law firm's funds with client funds in a client trust account except for the purpose of paying bank service charges.

  c. Lawyers are prohibited from withdrawing cash from a client trust account.

47.     Wells Fargo has been aware at all times since the opening of the NM IOLTA Account that Pettit was the sole signatory on that account.[58]  As noted above, prior to the actual opening of the NM IOLTA Account, Wells Fargo opened its internal Case # 129755342 to investigate whether a Pettit, a non-lawyer under New Mexico law, could be the sole signatory to a NM IOLTA account.  Without explaining their conclusion, "Deb" with the "Resolution Team" of Wells Fargo coordinated with "Elisa" of the National Business Banking Center for Wells Fargo and determined that Wells Fargo did not have to follow New Mexico law and permitted Pettit, a non-lawyer in New Mexico, to be the sole signatory on the NM IOLTA Account.[59]  Wells Fargo was reminded by the State Bar of New Mexico on May 12, 2021, less than a month after Pettit began misusing the NM IOLTA Account and prior to Pettit's misappropriation of nearly $30,000,000 from CP&A and the Pettit Victims, that Pettit was **_not_** a licensed New Mexico lawyer and therefore ineligible to have a NM IOLTA account.[60]  Following their prior practices, Aileen Sheffer

---

[58]  See Exhibit 12: Account 9174 Application and Signature Cards, Exhibit 24: Letter from the Supreme Court of New Mexico containing internal comment by Wells Fargo , Exhibit 4: WF-00004764 - 4770, and Exhibit 16: WF-00004779–4784

[59]  *Id.*

[60]  See Exhibit 24: Letter from the Supreme Court of New Mexico containing internal comment by Wells Fargo

a/k/a "atsheffe" with Wells Fargo concluded that "no action" should be taken even though "Chris Pettit isn't practicing law in New Mexico…[and] no other attorneys are listed as signers on the account".[61]

48.     Pettit opened the NM IOLTA account on September 21, 2017, with an initial deposit of $1,000.00.[62]  A second $1,000.00 deposit was made on December 22, 2017.[63] The next deposit into the NM IOLTA occurred on April 20, 2020, when a third deposit of $1,000.00 was made into the account.[64]  No further activity occurred in the NM IOLTA account for another year.  The activity in the NM IOLTA Account changed dramatically beginning on April 15, 2021.  In the 13 months between April 15, 2021 and June 1, 2022 - the date on which Pettit and CP&A filed their voluntary chapter 11 proceedings – a total of $32,155,011.70 was deposited into the NM IOLTA Account. The deposits into the NM IOLTA Account include the following:

a.  CP&A Deposits - $1,266,255.54[65]

b.  1031 Exchange Deposits - $13,018,691.32[66]

c.  Pettit Deposits - $2,445,257.29[67]

d.  Estate Distribution Deposits - $2,238,543.72

e.  Mineral Royalty Deposits - $2,073,241.76

f.  Claim Resolution Deposits - $1,273,222.94

g.  Pension Distribution Deposits - $733,559.36

h.  Trust Distribution Deposits - $542,050.74

---

[61]  *Id.*
[62]  See Exhibit 31: Account 9174 September 2017 Statement
[63]  See Exhibit 32: Account 9174 December 2017 Statement 2360
[64]  See Exhibit 33: Account 9174 April 2020 Statement
[65]  See Exhibit 27: Table of Account Activity
[66]  *Id.*
[67]  *Id.*

   i.   Annuity Payout Deposits - $374,733.94

   j.   Client Self-Disbursement Deposits - $325,035.96

   k.   Third Party Payment to Client Deposits - $185,404.53

   l.   Acting as Trustee Deposits - $91,816.24

   m.  Client IRS Refund Deposits - $3,204.59

   n.   Guardian ad litem Deposits - $1,958.33

   o.   Other Deposits - $11,124,145.80[68]

### E. The theft of the Verstuyft and Beyer Living Trust 1031 Exchange proceeds

49.    Between April 2021 and May 2022, Pettit undertook eighteen 1031 Exchange transactions – each of which occurred in Texas – and Wells Fargo assisted Pettit in funneling $13,018,691.32[69] through the NM IOLTA Account of CP&A only to use all or substantially all of those funds for his personal benefit and the benefit of Wells Fargo.

### i. The Verstuyft 1031 Exchange

50.    Mark and Robin Verstuyft (the "Verstuyfts") were directed to Pettit and CP&A through their cousins, the Persyns,[70] who previously had utilized CP&A as a 1031 Exchange intermediary. The Verstuyfts communicated with Pettit and other employees of CP&A for the purpose of confirming the ability and willingness of CP&A to serve as the 1031 Exchange agent in connection with the proposed sale and exchange of a portion of their family farmland located in Bexar County, Texas. Pettit, on behalf of CP&A confirmed that CP&A would serve as the "qualified intermediary for a possible 1031

---

[68] *Id.*

[69] See Exhibit 34: Table of 1031 Exchanges

[70] The Persyns are presently involved in litigation with Chicago Title and Pettit in Adversary No. 22-05080-cag regarding the liability of Chicago Title for the loss of in excess of $14,000,000 by the Persyn family as a result of the alleged misappropriation by Pettit of their 1031 Exchange proceeds.

exchange" and provided that confirmation to Martin Abstract Co., Inc., the title company engaged by the Verstuyfts to close the proposed transaction. The confirmation by Pettit occurred by written correspondence dated January 27, 2022[71] and advised both Martin Abstract Co. and the Verstuyfts of the following:

Our law firm's escrow account is with Wells Fargo Bank. At the time of closing and funding, Mr. Verstuyft's portion of the proceeds would be distributed as follows:

Receiver: Chris Pettit & Associates, P.C. as qualified intermediary for Mark Verstuyft
Receiving Bank: Wells Fargo Bank
Routing Number: 121000248
Account Number: 2537419174
Reference: Mark Verstuyft
Taxpayer Identification number: 74-2801267

The January 27 correspondence was signed:

Very truly yours,
CHRIS PETTIT & ASSOCIATES, P.C.

Christopher J. Pettit
CJP:sas

Very truly yours,

Mark Verstuyft

51.     The Verstuyfts closed the first leg of the 1031 Exchange by the sale of a portion of their family farm on April 18, 2022. Martin Abstract Co. remitted, via wire transfer, the sum of $2,902,911.55 (the "Verstuyft 1031 Deposit") to the NM IOLTA Account.[72] The Verstuyft 1031 Deposit was received in the NM IOLTA Account on April 18, 2022 as evidenced by the April NM IOLTA Account statement.

---

[71] See Exhibit 35: January 27, 2022 CP&A Letter to Martin Abstract Co.
[72] See Exhibit 36: Wire Confirmation from Martin Abstract

April 30, 2022 ■ Page 5 of 12



**Transaction history(continued)**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 4/15 | < | Business to Business ACH Debit - Irm Capital Irm Capita 220414 56136 Chris Pettit Assoc... | | 4,216.00 | |
| 4/15 | < | Business to Business ACH Debit - Irm Capital Achpayment 220414 W069 Chris Pettit Associat | | 2,000.00 | |
| 4/15 | < | Business to Business ACH Debit - Csc 4152022 Default Recp ID Chris Pettit & Associa | | 34.90 | |
| 4/15 | | Paypal Inst Xfer 220415 Roblox Corp Christopher Pettit | | 99.99 | 336.58 |
| 4/18 | | NSF Return Item Fee for a Transaction Received on 04/15 $31,766.67 Check # 02752 | | 35.00 | |
| 4/18 | | State Sales Tax | | 2.36 | |
| 4/18 | | Deposit Made In A Branch/Store | 23,369.25 | | |
| 4/18 | | WT Fed#00018 First Commercial B /Org=Martin Abstract Company Inc Srf# 0000206218 Trn#220418164317 Rfb# | 2,902,911.55 | | |

52.    In the _11 days_ following the receipt of the Verstuyft 1031 Deposit, Wells Fargo permitted Pettit to drain the account resulting in a negative balance in the NM IOLTA Account as of April 29, 2022.[73]

April 30, 2022 ■ Page 10 of 12



**Transaction history(continued)**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 4/29 | | Interest Payment | 112.96 | | |
| 4/29 | | Int Transferred to NM 000001060470705 | | 112.96 | -519.33 |
| **Ending balance on 4/30** | | | | | **-519.33** |
| **Totals** | | | **$3,789,005.36** | **$3,790,692.56** | |

53.     The Verstuyfts acknowledge that at least a portion of the Verstuyft 1031 Deposit was commingled with other funds, including CP&A funds.  As is discussed below, at the time of the acceptance of the Verstuyft 1031 Deposit Wells Fargo had _actual knowledge_ that Pettit was not legally eligible to control the NM IOLTA Account.  In the

---

[73]    See Exhibit 37: April 2022 Statement for Account *9174

span of a mere 11 days, Wells Fargo enabled the looting of the Verstuyft 1031 Deposit

by Pettit by permitting Pettit to:

     a.  Make 15 transfers to the Pettit Personal Account totaling $375,000;

     b.  Make 87 transfers to persons/entities unrelated to the Verstuyfts;

     c.  Make 1 transfer to Pettit at his personal Martha's Vineyard account;

     d.  Make 1 transfer to Pettit's brother;

     e.  Make 5 transfers to new CP&A accounts opened at Wells Fargo;

     f.  Make 27 transfers to litigation funding entities including Libertas Funding, IRM Capital, and Principal Financial;

     g.  Make 7 payments to utility service providers including AT&T, SAWS, and Waste Management;

     h.  Make 18 additional payments to third parties for the stated benefit of Pettit;

     i.  Make 2 cash withdrawals totaling $25,000;

     j.  Make 107 payments via check to persons/entities unrelated to the Verstuyfts, and;

     k.  Make 1 payment to Wells Fargo identified as "NSF Return Item Fee.[74]

54.    Each of the transactions delineated immediately above are either wholly

outside the scope of the use of a lawyer's trust account and clearly outside the scope of

the use of trust funds earmarked for the Verstuyfts. At a minimum, or in light of the

multitude of irregular transactions predating the Verstuyft Deposit, these transactions

should have been subjected to further scrutiny by Wells Fargo. In fact, the payment of

NSF Return Item Fee is in direct violation of Wells Fargo's own policies and procedures

related to IOLTA accounts.[75] Because Wells Fargo had actual knowledge of the fact that

Pettit was legally disqualified from being a - much less the sole - signatory on the NM

---

[74]  *Id.*
[75]  See Exhibit 38: WF-00004868–4949 at WF-00004870

IOLTA Account, had been reminded of Pettit's unauthorized status by the State Bar of New Mexico by written correspondence on May 12, 2021,[76] and had actual knowledge of a multitude of irregular if not outright illegal transactions by Pettit in the NM IOLTA Account, Wells Fargo had a duty to investigate each of these discreet transactions, which duty Wells Fargo simply ignored.[77]

### ii. The Beyer Living Trust 1031 Exchange

55.     The Beyer Living Trust is a former client of CP&A.  On May 10, 2022, the Beyer Living Trust sold a parcel of real estate located at 1104 Impala Drive, Granite Shoals, Texas.  Pettit, on behalf of CP&A confirmed that CP&A would serve as the "qualified intermediary for a possible 1031 exchange" and provided that confirmation to Capital Title, the title company engaged by the Beyer Living Trust to close the proposed transaction.  The confirmation by Pettit occurred by written correspondence dated May 4, 2022.  Upon closing and funding, the net proceeds of that sale were wired to the NM IOLTA account of CP&A.  More specifically, on May 11, 2022, the $1,162,786.17 was wired to Wells Fargo Bank account number xxxxxx9174. At the time these net proceeds were received by Chris Pettit & Associates P.C. there was a negative balance in the NM IOLTA Account as it was overdrawn by $820.91.

56.     In the *6 days* following the receipt of the Beyer Living Trust 1031 Deposit, Wells Fargo permitted Pettit to drain the account resulting in a negative balance in the NM IOLTA Account as of May 17, 2022.

---

[76]  Exhibit 24: Letter from the Supreme Court of New Mexico containing internal comment by Wells Fargo
[77]  See ECF 885, ¶d – e, page 4

57.     Wells Fargo enabled the looting of the Beyer Living Trust 1031 Deposit by Pettit by permitting Pettit to:

   a.  Make 3 transfers to the Pettit Personal Account totaling $80,000.00;

   b.  Make a $492,159.70 transfer to Escrow Funding Inc. for payment on a residence held by Pettit, or an entity controlled by Pettit, in New Orleans Louisiana;

   c.  Make 8 transfers to new CP&A accounts at Wells Fargo;

   d.  Make 16 transfers to litigation funding and merchant account lenders entities including Libertas Funding, IRM Capital, and Unique Funding Solutions for a total of $101,065.15;

   e.  Make 15 payments via bank wire or ACH transfer to third parties for the stated benefit of Pettit including $80,000.00 to bankruptcy counsel and $100,000.00 to Pettit's criminal defense counsel;

   f.  Make 28 payments via check to persons/entities unrelated to the Beyer Living Trust including payments to Pettit's brother and Facebook;

   g.   Make a cash withdrawal of $10,000.00, and;

   h.  Make 7 payments to Wells Fargo identified as "NSF Return Item Fee."[78]

In fact, the payment of NSF Return Item Fee is in direct violation of Wells Fargo's own policies and procedures related to IOLTA accounts.[79]

### F.  Wells Fargo failed to stop Pettit in favor of its own financial gain.

58.     In the face of the actual knowledge that Pettit was not legally eligible to be the signatory on NM IOLTA Account, Wells Fargo knowingly permitted, and in some circumstances actually assisted, Pettit in violating New Mexico law regarding the opening and maintenance of lawyer trust accounts. The incidences, all of which are prohibited, included:

---

[78]   See Exhibit 39: May 2022 Statement for Account *9174
[79]   See Exhibit 38: WF-00004868 – 4949 at WF-00004870

a. Knowingly permitting a person without a New Mexico law license to be the sole signatory on the NM IOLTA Account;

b. Knowingly permitting and assisting Pettit in making 50 discreet cash withdrawals totaling $1,215,161.89 from the NM IOLTA Account;

c. Knowingly permitting and assisting Pettit in making 4 discreet transfers from the CP&A operating account (9746) totaling $58,100.00 into the NM IOLTA Account;

d. Knowingly permitting and assisting Pettit in making 4 discreet transfers from the Pettit Personal Account totaling $1,431,490.00 into the NM IOLTA Account;

e. Knowingly permitting and assisting Pettit in making 102 discreet transfers into the Pettit Personal Account totaling $2,115,459.00 from the NM IOLTA Account;

f. Knowingly permitting and assisting Pettit in making 1 discreet transfer into his personal account ending in 2925 at Martha's Vineyard Bank in the amount of $30,000.00 from the NM IOLTA Account;

g. Knowingly permitting and assisting Pettit in making 11 discreet transfers into his personal account ending in 1524 at Winter Park Bank totaling $237,500.00 from the NM IOLTA Account;

h. Knowingly permitting and assisting Pettit in making 1 discreet transfer into the account ending in 2043 at Winter Park Bank for which Pettit is the Ultimate Beneficial Owner in the amount of $1,000.00 from the NM IOLTA Account;

i. Knowingly permitting and assisting Pettit in making 1 discreet transfer into the account ending in 2050 at Winter Park Bank for which Pettit is the Ultimate Beneficial Owner in the amount of $1,000.00 from the NM IOLTA Account;

j. Knowingly permitting and assisting Pettit in making 1 discreet transfer into the account ending in 2068 at Winter Park Bank for which Pettit is the Ultimate Beneficial Owner in the amount of $1,000.00 from the NM IOLTA Account, and;

k. Knowingly permitting and assisting Pettit in making 29 discreet transfers from the NM IOLTA Account to pay the Argyle Mortgage to Wells Fargo.

59. When Wells Fargo opened the NM IOLTA, it understood the restrictions and rules governing lawyer trust accounts in New Mexico and it was aware of the sort of

activity that was authorized under New Mexico law for IOLTA accounts. Wells Fargo is identified as a "Leadership Circle" depository institution by the New Mexico State Bar. New Mexico law requires all banks that will serve as an IOLTA depository to agree in writing that such bank will adhere to the regulations outlined by the New Mexico Supreme Court.  It likely did or certainly should have forecasted that the NM IOLTA Account would be used in a manner consistent with a law firm of its size and with a practice focused on Wills, Estates, Probate, and Personal Injury. Wells Fargo should have, and FFEIC required that it monitor the NM IOLTA Account activity with those parameters in mind. But from the very start, and throughout the time that followed, Pettit's use of the NM IOLTA Account bore no resemblance to that predicted activity. Instead, the account activity should have triggered one Red Flag warning after another at Wells Fargo.  Unfortunately, Wells Fargo ignored each of the dozens of red flags and assisted Pettit to perpetrate the fraud and breach of fiduciary duty on the Pettit Victims and CP&A described in this Complaint.

**G. Wells Fargo has a culture of disregarding its own policies and procedures as well applicable laws and regulations in favor of profits without regard to the consequences to those like the Pettit Victims.**

60.    Wells Fargo has a well-documented history of disregarding its legal responsibilities in favor of shareholder profit.  Thanks to federal oversight, Wells Fargo has been subject to multiple Consent Orders and, not long after bending the rules for Pettit, Wells Fargo was subjected to what the American Banker called a "novel condition" of operations effective February 2, 2018 when the Federal Reserve Board of Governors imposed an "asset cap order" on Wells Fargo prohibiting it from growing beyond its $1.95

trillion asset size – the size of Wells Fargo as of December 31, 2017.[80]  According to the American Banker, "[t]he unprecedented move was the central bank's long-awaited response to a litany of scandals that had embroiled [Wells Fargo] in the prior several years.  The most visible of those scandals related to bank employees opening millions of unauthorized credit cards and checking accounts….".[81] As reported in the American Banker, the Federal Reserve confirmed that the asset cap order was issued "in response to "widespread consumer abuses and other compliance breakdowns" at the bank, and would remain in place "until it sufficiently improves its governance and controls"".[82]

61.    From the perspective of CP&A and the Pettit Victims, it is understandable why the Federal Reserve has not lifted the asset cap order since its imposition more than five years ago.  2021 was a particularly fine-filled year for Wells Fargo resulting from its continuing and chronic failure to address its systemic disregard of applicable laws and regulations. Just in the period between April 2021 and the present, Wells Fargo has received the following fines relating to the systemic failures:

| Penalty Date | Penalty Amount | Description | Agency |
|---|---|---|---|
| 3/30/2023 | 67,762,500 | The Federal Reserve Board fined Wells Fargo & Co. for the firm's unsafe or unsound practices relating to historical inadequate oversight of sanctions compliance risks at its subsidiary bank, Wells Fargo Bank, N.A. Wells Fargo & Co.'s deficient oversight enabled the bank to violate U.S. sanctions regulations by providing a trade finance platform to a foreign bank that used the platform to process approximately $532 million in prohibited transactions between 2010 and 2015. | Federal Reserve |

---

[80]    Kyle Campbell & Polo Rocha, Wells Fargo's asset cap is turning 5. how will it end? *American Banker* (2023), https://www.americanbanker.com/news/wells-fargos-asset-cap-is-turning-5-how-will-it-end (last visited Apr 11, 2023).

[81]    *Id.*

[82]    *Id.*

| Penalty Date | Penalty Amount | Description | Agency |
|---|---|---|---|
| 3/30/2023 | 30,000,000 | The Office of Foreign Asset Control announced that Wells Fargo Bank agreed to settle potential civil liability for 124 apparent violations from 2008 until 2015 Wells Fargo, and its predecessor, Wachovia Bank, provided a foreign bank with software used to process trade finance transactions with U.S.-sanctioned jurisdictions and persons. | Office of Foreign Assets Control |
| 12/20/2022 | 3,700,000,000 | The Consumer Financial Protection Bureau ordered Wells Fargo Bank to pay more than $2 billion in redress to consumers and a $1.7 billion civil penalty for legal violations across several of its largest product lines. The CFPB stated the the bank's illegal conduct led to billions of dollars in financial harm to its customers. Consumers were said to have been illegally assessed fees and interest charges on auto and mortgage loans, had their cars wrongly repossessed, and had payments to auto and mortgage loans misapplied by the bank. | Consumer Financial Protection Bureau |
| 9/1/2022 | 22,000,000 | OSHA found that Wells Fargo violated the whistleblower protection provisions of the Sarbanes-Oxley Act for improperly terminating a Chicago area-based senior manager in the company's commercial banking segment. The senior manager had repeatedly voiced concerns to area managers and the corporate ethics line regarding conduct they believed violated relevant financial laws, including wire fraud.  The manager expressed concerns that they were directed to falsify customer information and alleged that management was engaged in price fixing and interest rate collusion through exclusive dealing. | Occupational Safety & Health Administration |
| 5/20/2022 | 7,000,000 | The Securities and Exchange Commission announced charges against Wells Fargo Advisors for failing to file at least 34 Suspicious Activity Reports (SARs) in a timely manner between April 2017 and October 2021. Wells Fargo Advisors agreed to pay $7 million to settle the charges. | Securities and Exchange Commission |
| 9/27/2021 | 72,600,000 | Federal prosecutors settled a civil fraud lawsuit against Wells Fargo Bank, N.A. alleging that it violated the Financial Institutions Reform Recovery and Enforcement Act by fraudulently overcharging customers, including small businesses and federally-insured financial institutions, which used the bank's foreign exchange service.  The United States alleged that, from 2010 through 2017, Wells Fargo FX sales specialists defrauded customers by systematically charging higher markups on FX transactions than they represented the bank would charge and concealing these overcharges through various misrepresentations and deceptive practices. | U.S. Attorney-Southern District of New York |

| Penalty Date | Penalty Amount | Description | Agency |
|---|---|---|---|
| 9/9/2021 | 250,000,000 | Unsafe or unsound practices related to material deficiencies regarding the bank's loss mitigation activities, including loan modification decisions and operational practices, and inadequate Independent Risk Management and Internal Audit of the bank's loss mitigation activities. | Office of the Comptroller of the Currency |

62.    The chronic disregard by Wells Fargo of its duties and obligations to depositors and those who deal with depositors that manage trust funds must be addressed by this Court in a manner that will, once and for all, impress upon Wells Fargo that it will no longer be permitted to turn a blind eye to the damage being visited upon others for the sake of its own profitability.

## V.
## APPLICABLE LAW AND STANDING

### A. Texas law applies to the determination of the torts of breach of fiduciary duty and fraud perpetrated by Pettit and Wells Fargo against CP&A and the Pettit Victims.

63.    Each of the Plaintiffs are Texas residents. Virtually all of the deposits into the NM IOLTA Account and withdrawals from the NM IOLTA Account originated from transactions occurring in the State of Texas.  The NM IOLTA Account was opened at branch of Wells Fargo located in San Antonio, Texas. Each of the 1031 Exchanges and the resulting deposits into the NM IOLTA Account involved real estate transactions that occurred in Texas and were processed through title companies located in Texas.

### B. Each of the Plaintiffs have standing to pursue the claims against Pettit and Wells Fargo

64.    In order for constitutional standing under Article III to exist, there must be three elements present as to each claim or cause of action: (1) injury in fact, (2) a causal connection, and (3) redressability.  *Lujan v. Defenders of Wildlife* 504 U.S. 555, 112 S.

Ct. 2130 119 L.Ed. 2nd 351 (1992). Here, each Plaintiff suffered an injury in fact as Wells Fargo knowingly allowed money deposited on behalf of each Plaintiff to be misappropriated by Pettit. There is a direct connection with the deposits made into the NM IOLTA Account for the benefit of each of the Plaintiffs and the immediate disappearance of those funds for Pettit's personal benefit, all on Wells Fargo's watch. The harm suffered by each Plaintiff could easily be redressed by the reimbursement of the damages suffered by each respective Plaintiff. Additionally, the Trustee has standing to bring these claims because CP&A was formerly the qualified agent for the 1031 Victims and thus, was a "fiduciary" which could bring suit on the Victim's behalf. The Trustee has essentially inherited standing from CP&A, as its bankruptcy estate representative.

### VI.
### CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty — Christopher Pettit, Individually

65. Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 64 as if fully set forth herein.

66. Wells Fargo is a bank as defined by the Texas Business & Commerce Code §4.105.

67. Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of that duty, (3) causation, and (4) damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) A fiduciary relationship can be formal or informal. *See Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005). Formal fiduciary relationships arise as a matter of law, such as with attorney-clients, partnerships, and trustee relationships. *See id.* at 330. Informal fiduciary

relationships can arise from moral, social, domestic, or purely personal relationships of trust and confidence. *See id*. at 331.

68.     Pettit, at the time of the events made the subject of this complaint, was a lawyer licensed only in the State of Texas.  He was also the sole director, but not the only lawyer practicing under the law firm known as CP&A.

69.     Pettit was a fiduciary to CP&A. With regard to CP&A, the fiduciary relationship exists by virtue of his role as an officer and director of the law firm and because there existed between Pettit and CP&A a relationship of trust and confidence.

70.     Pettit was fiduciary to both the Verstuyfts and the Beyer Living Trust.  With regard to the relationship between Pettit and the Verstuyfts, the fiduciary relationship arose upon the acceptance of the representation of the Verstuyfts in the context of the 1031 Exchange and the deposit of the Verstuyft 1031 Deposit into the NM IOLTA Account. With regard to the relationship between Pettit and the Beyer Living Trust, likewise a fiduciary relationship arose upon the acceptance of the representation of the Beyer Living Trust in the context of the 1031 Exchange and the deposit of the Beyer 1031 Deposit into the NM IOLTA Account.

71.     Pettit owed a fiduciary duty in connection with funds in the NM IOLTA Account over which Pettit, as the sole signatory on the account, acted as trustee for the benefit of CP&A, the Verstuyfts, and the Beyer Living Trust. Pettit also owed a fiduciary duty in conjunction with accepting the 1031 Exchange funds which were to be held in a segregated fashion for the benefit of the Verstuyfts and the Beyer Living Trust, respectively, though deposited into the NM IOLTA Account with other funds of CP&A. Pettit, as the sole signatory on the NM IOLTA Account – as authorized by Wells Fargo in

derogation of New Mexico law - maintained control over those funds upon receiving them and owed duties of loyalty and care to, and to deal honestly and in good faith with, the Plaintiffs. This entailed, among other things, the fiduciary duty to use the funds in the manner expected and trusted by the Plaintiffs.

72.    Wells Fargo knew fiduciary duties were owed to all those whose funds were deposited in the NM IOLTA Account. It is undisputed that Wells Fargo is familiar with IOLTA accounts, knows that IOLTA accounts are trust accounts,[83] and knows that attorneys owe fiduciary duties to their clients in connection with the funds on deposit in IOLTA accounts, including the NM IOLTA Account.

73.    Pettit breached his fiduciary duty to Plaintiffs by using their funds for purposes other than those intended. Pettit caused funds to be deposited into, maintained within, and transferred from the NM IOLTA Account inconsistent with the norms and rules for such accounts, and failed to operate the NM IOLTA Account in the manner (and with the protections with which) such trust accounts are required to be operated. Rather than spending the funds as intended, Pettit diverted and misappropriated the funds in the NM IOLTA Account for his own personal gain and the gain of Wells Fargo.

74.    CP&A was damaged by Pettit's breach of his fiduciary duty in an amount equal to the losses suffered by CP&A for misappropriation by Pettit of funds in the NM IOLTA Account. The damage suffered by CP&A is evidenced by Proof of Claims No. 120 filed in the Christopher John Pettit bankruptcy proceedings.

75.    The Verstuyfts were damaged by Pettit's breach of his fiduciary duty in an

---

[83]  As confirmed by Bridget Cerny, Wells Fargo representative. At the time of the filing of this Complaint, the Cerny transcript was not available.  Plaintiffs reserve the right to supplement with the Transcript excerpts.

amount equal to the Verstuyft 1031 Deposit less the amount of that deposit which is attributable to the CP&A damage due to the comingling of funds at the hand of Pettit, plus the capital gains taxes and, as applicable, penalties payable to the Internal Revenue Service as a result of the breach of fiduciary duty and resulting misappropriation by Pettit.

76.    The Beyer Living Trust was damaged by Pettit's breach of his fiduciary duty in an amount equal to the Beyer 1031 Deposit attributable to the CP&A damage due to the comingling of funds at the hand of Pettit, plus the capital gains taxes and, as applicable, penalties payable to the Internal Revenue Service as a result of the breach of fiduciary duty and resulting misappropriation by Pettit.

77.    The actual and foreseeable result of the conduct of Pettit was the loss of funds in the NM IOLTA Account and the Texas IOLTA Account.  Those losses total at least $33,111,752.45.[84]

## COUNT II
## Joint Tortfeasor Liability for Knowing Participation in the Breach of the Fiduciary Duty of Pettit to the Clients of CP&A by Wells Fargo

78.    Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 64 as if fully set forth herein.

79.    Wells Fargo knowingly allowed the NM IOLTA Account to be opened by Pettit who was prohibited under New Mexico law from being a signatory, much less the sole signatory, on a New Mexico IOLTA account.  Wells Fargo permitted the NM IOLTA Account to be operated in a manner that bore no reasonable resemblance to how trust accounts should actually be used. Wells Fargo had actual knowledge of the breach of fiduciary duty perpetrated by Pettit. Wells Fargo knew that the NM IOLTA Account had

---

[84] See Exhibit 27: Table of Account Activity

been illegally opened and used by Pettit to facilitate the deposit and withdrawal of nearly $35 million over a period of approximately ***13 months***. Wells Fargo had actual knowledge that Pettit used the funds in the NM IOLTA Account 29 times in that 13-month period ***to pay his personal mortgage obligations to Wells Fargo***. Wells Fargo had actual knowledge of the chronic misuse of the NM IOLTA Account by Pettit and elected to disregard those actions in violation of its duty. *Wichita Royalty Co. v. City Nat'l Bank*, 127 Tex. 158, 89 S.W.2d 394 (1935); *Wichita Royalty Co. v. City Nat'l Bank*, 306 U.S. 103, 59 S.Ct. 420, 83 L.Ed. 515 (1939); *Wichita Royalty Co. v. City Nat'l Bank*, 109 F.2d 299 (5th Cir. 1940). Wells Fargo knew that its actions in permitting deposits into and withdrawals out of the NM IOLTA Account constituted a bad faith disregard of the duties of Wells Fargo to investigate the activities in the NM IOLTA Account ***at a minimum*** from and after the notification by the State Bar of New Mexico on May 12, 2021 – approximately 30 days after the first actual activity in NM IOLTA and more than 11 months *prior to* the misappropriation of the Verstuyft 1031 Deposit and one year prior to the Beyer Living Trust 1031 Deposit. *Id.* The vast majority of the NM IOLTA Account transactions at issue in this case were improper on their face. Wells Fargo witnessed, and in some instances actually participated in, the clear and unambiguous events of misappropriation of the trust funds on deposit in NM IOLTA Account by facilitating the transfers for Pettit. With the actual knowledge and endorsement of the illegal opening of the NM IOLTA Account, Wells Fargo had a duty to investigate each of these events and it acted in bad faith when it *chose* not to investigate or otherwise take action to protect Plaintiffs' funds in violation of applicable Texas law. *Id.*

80.     Wells Fargo substantially benefited from the scheme perpetrated by Pettit, due not only to the substantial additional funds flowing through the bank as a result of the magnitude of the scheme, but because of the use of the trust funds from the NM IOLTA Account to pay the Argyle Mortgage. Through the scheme Wells Fargo earned income from fees and from investing capital derived from CP&A and Pettit Victims, including the Verstuyfts and the Beyer Living Trust.

81.     The evidence shows that but for the willingness of Wells Fargo to enable Pettit the losses incurred through the NM IOLTA Account would not have occurred. The actual and foreseeable result of the conduct of Wells Fargo was the loss of funds in the NM IOLTA Account and the Texas IOLTA Account.   Those losses total at least $33,111,752.45.[85]

## COUNT III
### Fraud — Pettit

82.     Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 64 as if fully set forth herein.

83.     The elements of fraud under Texas law are:

a.  the defendant made a material misrepresentation;

b.  the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth;

c.  the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and

d.  the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co*., 348 S.W.3d 194, 217, 54 Tex. Sup. Ct. J. 761 (2011) (*citing DeSantis v. Wackenhut Corp*.,

---

[85] *Id.*

793 S.W.2d 670, 688 (Tex. 1990); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).

84. Pettit defrauded each of the Plaintiffs by making representations to each of them that he would act in their best interest in connection with the performance of the duties and functions which Pettit agreed to perform.

85. The fraud perpetrated against CP&A arose out of the material misuse of the funds on deposit in the NM IOLTA Account including the misappropriation of those monies for the personal benefit of Pettit and the direct financial detriment of CP&A.

86. The fraud perpetrated by Pettit against the Verstuyfts arose out of the 1031 Exchange. Pettit represented that CP&A was a qualified 1031 Exchange intermediary and that CP&A would receive, hold, and preserve the Verstuyft 1031 Exchange Deposit in the NM IOLTA Account for the sole and exclusive benefit of the Verstuyfts.

87. The fraud perpetrated by Pettit against the Beyer Living Trust arose out of the 1031 Exchange. Pettit represented that CP&A was a qualified 1031 Exchange intermediary and that CP&A would receive, hold, and preserve the Beyer 1031 Exchange Deposit in the NM IOLTA Account for the sole and exclusive benefit of the Beyers.

88. Pettit made material misrepresentations to each of CP&A, the Verstuyfts, and the Beyer Living Trust that Pettit knew were false or made with reckless disregard for truth, which Pettit made to each of them with the intent that they each would act, and did in fact act, on those representations, and which Pettit intended to serve as an inducement to each of CP&A, the Verstuyfts, and the Beyer Living Trust to rely on the representations of Pettit. Each of the Plaintiffs were led to believe and find security in the fact that their funds were being maintained at the nation's fourth largest bank – Wells Fargo – and those funds would be safe in the custody and under the watchful intelligence of that bank. As

set forth above, each of CP&A, the Verstuyfts, and the Beyer Living Trust suffered injury by actively and justifiably relying on the representations of Pettit. The actual and foreseeable result of the conduct of Wells Fargo was the loss of funds in the NM IOLTA Account and the Texas IOLTA Account. Those losses total at least $33,111,752.45.

**COUNT IV**
**Joint Tortfeasor Liability for Knowing Participation in the Perpetration of Fraud by Pettit Against the Clients of CP&A —by Wells Fargo**

89.    Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 64 as if fully set forth herein.

90.    Pettit intentionally misrepresented and omitted material facts in connection with the use of the NM IOLTA Account and the intention of Pettit regarding the solicitation and acceptance of 1031 Exchange transactions. Plaintiffs reasonably relied to their detriment on such representations and omissions by depositing their money in the NM IOLTA Account at Wells Fargo and utilizing CP&A as a "qualified" 1031 Exchange intermediary.   In the absence of these misrepresentations, neither CP&A nor the Verstuyfts or the Beyer Living Trust would have made these deposits or permitted the transactions to occur.   Wells Fargo knowingly and substantially provided material assistance to Pettit in furtherance of his scheme to defraud CP&A, the Verstuyfts, and the Beyer Living Trust. Wells Fargo knowingly allowed the NM IOLTA Account to opened in violation of New Mexico law and to be operated in a manner that bore no reasonable resemblance to how such trust accounts should actually be used. Wells Fargo knew that the NM IOLTA Account had been created in violation of New Mexico law and yet facilitated and permitted the deposit and withdrawal of nearly $34 million from the account in less than 13 months, including permitting in excess of $116,900.53 to paid by Pettit to the

Argyle Mortgage, $2,115,459.00 to be transferred directly to the Pettit Personal Account, and $1,215,161.89 in cash withdrawals in direct violation of New Mexico law and without accurate CTR reporting compliance, among the host of other improper payments from an IOLTA account. Wells Fargo witnessed systematic, continuous evidence of probable money laundering and fraudulent activity, yet took no action to stop the misconduct, and instead substantially assisted the continued operation of the NM IOLTA Account to perpetrate the scheme and continued to execute all requested banking transactions involving the NM IOLTA Account through and after the Petition Date.[86]

91.     Wells Fargo benefited from its participation in Pettit's scheme by earning income from fees, using inflows to boost its deposit average metrics, and from investing capital derived from the 1031 Exchanges. As a direct and proximate consequence of Wells Fargo's conduct as described in this complaint, Plaintiffs have lost significant funds they entrusted to Wells Fargo and the NM IOLTA Account, have been denied the use of those funds, and have been damaged in an amount to be determined at trial. The actual and foreseeable result of the conduct of Wells Fargo was the loss of funds in the NM IOLTA Account and the Texas IOLTA Account.     Those losses total at least $33,111,752.45.

## COUNT V
## Negligence — Wells Fargo and Pettit

92.     Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 64 as if fully set forth herein.

93.     Plaintiffs advance this count in the alternative to their other claims.

---

[86]   June 1, 2022

94.     At all relevant times, Pettit caused funds belonging to Plaintiffs to be deposited into the NM IOLTA Account at Wells Fargo. Wells Fargo knew the deposits were to be held in trust, but also knew the funds were being misappropriated for the personal use of Pettit, including for payment of Pettit's personal debts to Wells Fargo. Wells Fargo knew that the funds deposited into the NM IOLTA Account were not funds being held in a manner consistent with any of the norms and requirements applicable to lawyer trust accounts.

95.     Wells Fargo owed a duty to Plaintiffs with respect to the maintenance and use of the NM IOLTA Account at the first moment that Wells Fargo became aware that the NM IOLTA Account was not open or operating in accordance with applicable law. Wells Fargo's duty arose at the event of the opening of the account, but in no event later than the first withdrawal by Pettit of funds out of the NM IOLTA Account and arises independently from any contract. *Id.*

96.     Wells Fargo breached its duty to Plaintiffs when, among other things, it allowed the NM IOLTA Account to be operated in a manner that bore no reasonable resemblance to how such accounts are required to be used: Wells Fargo allowed Pettit to repeatedly transfer funds from the NM IOLTA Account to (1) pay his personal debt to Wells Fargo – the Argyle Mortgage; (2) withdraw hundreds of thousands of dollars in cash from the NM IOLTA Account in violation of New Mexico law; (3) transfer hundreds of thousands of dollars to the Pettit Personal Account; (4) transfer hundreds of thousands of dollars to other Pettit accounts and Pettit creditors. Wells Fargo witnessed systematic, continuous evidence of money laundering and fraudulent activity, but took no action to stop the misconduct, and instead facilitated the continued operation of the NM IOLTA

Account to perpetrate the scheme and continued to execute all requested banking transactions involving the NM IOLTA Account, Wells Fargo knowingly disregarded its own policies and procedures as well as federal regulations by repeatedly failing to investigate the innumerable indicia of fraud and stop the misuse of the NM IOLTA Account.

97.     As a direct and approximate cause of the breach by Wells Fargo of the duty as described throughout this Complaint, Plaintiffs have sustained damages in an amount to be determined at trial.

### COUNT VI
### Conspiracy — Wells Fargo and Pettit

98.     Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 64 as if fully set forth herein.

99.     The scheme perpetrated by Pettit was a massive fraud which was perpetrated over a number of years, with many victims.  Wells Fargo enabled the fraudulent scheme by acting for its own pecuniary benefit and in complete disregard of applicable law. Wells Fargo, on information and belief, conspired with Pettit to fraudulently induce CP&A and the Pettit Victims, including the Verstuyfts and the Beyer Living Trust to allow their hard-earned money to be deposited into Wells Fargo. More specifically, Pettit and Wells Fargo acted together to open a trust account that was not authorized under applicable state law, steal money belonging to the Plaintiffs out of the NM IOLTA Account and, as applicable, the Texas IOLTA Account. Defendants acted together to accomplish this unlawful and illegal objective. Pettit and Wells Fargo through its employers had a meeting of the minds on the object of their actions or course of action which, as described in the Complaint, was to funnel as much money as possible to and through Wells Fargo Bank for the ultimate benefit of Wells Fargo and Pettit. The wrongful

acts of Wells Fargo and Pettit constitute one or more unlawful, overt acts which caused actual injury to the Plaintiffs as a proximate result of those acts.

## COUNT VII
### Texas Theft Liability Act — Wells Fargo and Pettit

100.    Plaintiffs incorporate the allegations, evidence presented, and recitations made in paragraphs 1 through 64 as if fully set forth herein.

101.    The Texas Theft Liability Act (the "Theft Act") is an available recovery for persons who are the victim of certain types of theft.  The Theft Act defines a "Person" to be "an individual, partnership, corporation, association, or other group, however organized." TX. Civ. Prac. & Rem. Code §134.001(1).  The Theft Act defines "Theft" as unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03, 31.04, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14, Penal Code.  TX. Civ. Prac. & Rem. Code §134.001(2).   The recovery available to a Person who has suffered a Theft is "the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000".  TX. Civ. Prac. & Rem. Code §134.005(1).   Additionally, a successful plaintiff is entitled to the recovery of attorneys' fees and expenses.

102.    Each Plaintiff had a possessory right to the funds deposited into the NM IOLTA Account for their respective benefits.   These funds include the Verstuyft 1031 Deposits, the Beyer 1031 Deposit, and the CP&A Deposits. Indeed, CP&A, as the trustee for its clients, had a possessory interest in <u>all</u> deposits made into the NM IOLTA Account. Defendants Pettit and Wells Fargo unlawfully appropriated these funds by taking them through a multitude of discreet Theft events without the consent of any of the Plaintiffs.

103.    Pettit and Wells Fargo, acting in concert and individually appropriated the funds, which are fiduciary property, with the intent to deprive each of the Plaintiffs of the funds through discreet transactions occurring between April 2021 and May 2022. As a result, each Plaintiff sustained damages resulting from the Defendants' Theft, including but not limited to all funds deposited into the NM IOLTA Account. As permitted by the Theft Act, the Plaintiffs seek all additional damages permitted there under including attorneys'' fees, expenses, actual damages, and punitive damages.

### EXEMPLARY AND PUNITIVE DAMAGES FOR PLAINTIFFS

104.    Plaintiffs. also seek exemplary and punitive damages in order to penalize Defendant Chris Pettit for his conduct that was outrageous, malicious, or otherwise morally culpable.

105.    Plaintiffs. also seek exemplary and punitive damages in order to penalize Defendant Wells Fargo for its conduct that was outrageous, malicious, or otherwise morally culpable.

106.    Furthermore, Plaintiffs request exemplary damages in excess of any statutory cap as Defendants' conduct constitutes a knowing, intentional or reckless misapplication of fiduciary property.[87]

### PRAYER

WHEREFORE, PREMISES CONSIDERED Plaintiffs respectfully request that the Court grant them following relief:

1.    <u>On Count I</u> – Enter judgment in favor of Plaintiffs and against Christopher Pettit, Individually and award Plaintiffs compensatory damages in an amount to be

---

[87]    See Tex. Civ. Prac. & Rem Code §41.008(c)(10)

determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this Defendant's conduct and its financial ability to pay;

2.      On Count II – Enter judgment in favor of Plaintiffs and against Wells Fargo and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this Defendant's conduct and its financial ability to pay;

3.      On Count III – Enter judgment in favor of Plaintiffs and against Christopher Pettit, Individually and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this Defendant's conduct and its financial ability to pay;

4.      On Count IV – Enter judgment in favor of Plaintiffs and against Wells Fargo and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this Defendant's conduct and its financial ability to pay;

5.      On Count V – Enter judgment in favor of Plaintiffs and against both Defendants, jointly and severally, and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of this Defendant's conduct and its financial ability to pay;

6.      On Count VI – Enter judgment in favor of Plaintiffs and against both Defendants, jointly and severally, and award Plaintiffs compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of the Defendants' conduct and its financial ability to pay;

7.     <u>On Count VII</u> – Enter judgment in favor of Plaintiffs and against both Defendants, jointly and severally, and award Plaintiffs compensatory damages in an amount to be determined at trial, statutory damages in the maximum amount authorized by law, plus punitive damages in an amount to be determined at trial appropriate to the severity of the Defendants' conduct and its financial ability to pay, and award Plaintiffs their attorney fees as applicable under the Texas Theft Liability Act;

8.     Award prejudgment interest on each Count to the extent allowed under applicable law or statute;

9.     Award Plaintiffs their reasonable attorney fees and costs to any Count to the extent allowed under applicable law or statute; and

10.    Grant the Plaintiffs such further relief this Court deems just and proper.

Respectfully submitted,

Luttrell + Carmody Law Group
One International Centre
100 N.E. Loop 410, Suite 615
San Antonio, Texas 78216
Tel.   210.426.3600
Fax   210.426.3610
luttrell@lclawgroup.net

By:/s/ Leslie M. Luttrell
    Leslie M. Luttrell
    State Bar No. 12708650

**ATTORNEYS FOR ROBIN AND MARK VERSTUYFT and ERIC B. TERRY, CHAPTER 11 TRUSTEE FOR THE ESTATE OF CHRIS PETTIT & ASSOCIATES, P.C.**

Villa & White, LLP
Attorneys at Law
1100 NW Loop 410, Suite 802
San Antonio, Texas 78213
Tel. 210.225.4500
Fax 210.212.4649
treywhite@villawhite.com

By:/s/ Morris E. "Trey" White III
    Morris E. "Trey" White III
    State Bar No. 24003162

**ATTORNEYS FOR THE BEYER LIVING TRUST and ERIC B. TERRY, CHAPTER 11 TRUSTEE FOR THE ESTATE OF CHRIS PETTIT & ASSOCIATES, P.C.**